UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Donald L. Symington,<br><br>    Plaintiff<br>v.<br><br>Candela Marine Technology AB,<br><br>    Defendant | Case No.: 2:25-cv-01973-JAD-BNW<br><br>**Order Granting Motions to Remand and Denying as Moot Motion to Dismiss**<br><br>[ECF Nos. 8, 10, 11, 19] |

Pro se plaintiff Donald Symington alleges that he placed a deposit on a Candela Marine Technology C-8 boat that he later permitted Candela to sell to another customer,[1] but Candela withheld his deposit and continued marketing a different vessel to him while concealing that the C-8 was unfit for his business needs.[2] Those negotiations ended in a cancellation-and-refund agreement under which Candela returned $28,000 of Symington's $33,772.50 deposit, and the parties mutually released all claims.[3] Symington now contends that he signed that agreement only because Candela misrepresented the C-8's capabilities, so he sues Candela[4] for fraudulent misrepresentation, fraudulent inducement, breach of contract, bad faith, and unjust enrichment.[5]

---

[1] ECF No. 3-1 at 3–4, ¶¶ 5–7; ECF No. 8-2.

[2] *Id.* at 4, ¶¶ 8–10, 12.

[3] *Id.* at 4, ¶ 11; ECF No. 8 at 7.

[4] There is some ambiguity about which entity Symington intends to sue. Candela Technology AB—the entity that has appeared and is litigating in this case—represents that no company named "Candela Marine Technology AB" exists. It explains that Candela Technology AB is a Swedish corporation headquartered in Sweden and that its U.S. affiliate, Candela Marine Technology Corporation, is incorporated in Delaware and based in Sausalito, California. ECF No. 20 at 4. Symington appears to have blended the two names in his suit. For the purposes of this order, I refer to both entities collectively as "Candela."

[5] ECF No. 3-1 at 4, ¶¶ 13, 16.

Candela removed this case from state court and now moves to dismiss it for lack of personal jurisdiction and for failure to state a claim. For his part, Symington has filed two motions to remand along with a supplemental remand motion. Because Candela has not shown that the amount in controversy more likely than not exceeds $75,000, I find that this court lacks subject-matter jurisdiction over this case. So I remand it back to state court and deny as moot Candela's dismissal motion without prejudice to its ability to raise that challenge in state court.

**Discussion**

A district court must first determine whether it has subject-matter jurisdiction to hear a case before it may address a case on the merits.[6] So this court must resolve Symington's motions to remand first before addressing Candela's motion to dismiss for lack of personal jurisdiction and for failure to state a claim.

28 U.S.C. § 1441(a) authorizes defendants to remove to federal court "any civil action brought in a [s]tate court of which the [U.S. District Courts] have original jurisdiction." There are two legally recognized bases for original federal-court jurisdiction: (1) federal-question jurisdiction under 28 U.S.C. § 1331, which allows a litigant to bring a claim in federal court if it arises under federal law, and (2) diversity jurisdiction under 28 U.S.C. § 1332.[7] When a case is filed in state court between parties who are citizens of different states, and the case value exceeds $75,000, the defendant may remove the case to federal court.[8]

"Federal courts are courts of limited jurisdiction."[9] So there is a strong presumption against removal jurisdiction, and "federal jurisdiction must be rejected if there is any doubt as to

---

[6] *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).
[7] 28 U.S.C. § 1332(a)(1).
[8] 28 U.S.C. §§ 1332, 1441, 1446.
[9] *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

2

the right of removal in the first instance."[10] The defendant always has the burden of establishing that removal is proper.[11]

**A.  Symington and Candela are diverse.**

A corporation is a citizen of its state of incorporation and the state in which it maintains its principal place of business.[12] Candela argues that diversity is satisfied because Candela Technology AB is incorporated and headquartered in Sweden.[13] Symington argues that Candela Marine Technology Corporation—an affiliated entity incorporated in Delaware with its principal place of business in California—destroys diversity because it's a United States entity.[14] But the diversity statute turns on *state* citizenship, not whether an entity is foreign or domestic. So even under Symington's framing, the Candela entities are citizens of Sweden, Delaware, and California, and because Symington is a Massachusetts citizen, the parties are completely diverse for jurisdictional purposes.

**B.  Candela has not met its burden to establish the amount in controversy.**

But completely diversity is just the first half of the § 1332 equation; the case value must also be more than $75,000. A defendant's burden to establish the amount in controversy is usually satisfied if the plaintiff claims a sum greater than the threshold requirement.[15] If the value of plaintiff's claim is unclear, the defendant must prove by a preponderance of the

---

[10] *Gaus v. Miles*, 980 F.2d 564, 566 (9th Cir. 1992).

[11] *Id.*

[12] *See* 28 U.S.C. § 1332(c)(1).

[13] ECF No. 20 at 4.

[14] ECF No. 10 at 2.

[15] *Id.* (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–99 (1938)).

3

evidence that the jurisdictional amount has been met.[16] Defendants may rely on facts presented in the removal petition and any summary-judgment-type evidence that is related to the amount in controversy.[17] Of course, the defendant does not have to predict the trier of fact's eventual award with certainty.[18] But neither do conclusory allegations overcome the presumption against removal jurisdiction or satisfy the defendant's burden of proving the amount in controversy.[19] Because Symington's complaint alleges only that the "amount in controversy exceeds $15,000, exclusive of interest and costs," and he disputes that it reaches $75,000,[20] Candela has the burden to prove by a preponderance of the evidence that the amount in controversy is sufficient.[21]

### 1.   *Symington's refusal to stipulate does not raise a reasonable inference that the amount in controversy is met.*

Candela relies on three nonbinding cases for the proposition that Symington's refusal to stipulate to a damages cap reasonably implies that he placed more than $75,000 in controversy.[22] Candela first cites the Seventh Circuit case, *Oshana v. Coca–Cola Co.*, in which the plaintiff's claims and requested remedies already signaled the potential for a substantial recovery.[23] Although Oshana purported to disclaim more than $75,000 in personal damages, she sought

---

[16] *Id.*; *see also Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 395, 404 (9th Cir. 1996) ("Under this burden, the defendant must provide evidence establishing that it is 'more likely than not' that the amount in controversy exceeds that amount.").

[17] *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003).

[18] *Id.*

[19] *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004) (internal citations omitted).

[20] ECF No. 19 at 2.

[21] ECF No. 3-1 at 3, ¶ 3.

[22] ECF No. 20 at 6 (citing *AJ Constr. LLC v. Next Ins. US Co.*, 2024 WL 3665938, at *2 (D. Nev. Aug. 5, 2024); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 512 (7th Cir. 2006); *Felipe v. Target Corp.*, 572 F. Supp. 2d 455, 459 (S.D.N.Y. 2008)).

[23] *Oshana*, 472 F.3d 506.

punitive damages, attorneys' fees, and disgorgement of Coca–Cola's Illinois profits—remedies that, taken together, could easily exceed the jurisdictional threshold.[24]  When Coca–Cola asked her to stipulate that she would not seek more than $75,000, she refused.[25]  The Seventh Circuit held that this refusal, coupled with the fact that Coca–Cola's Illinois profits ran into the millions, reasonably supported the inference that more than $75,000 was in controversy.[26]  Even if full disgorgement was unlikely, some portion of it, combined with the compensatory damages, statutory punitive damages, and recoverable fees, could plausibly push the claim over the threshold, making Oshana's refusal relevant, the court reasoned.[27]

The two district-court cases Candela cites likewise featured refusals to stipulate that raised a reasonable inference of the jurisdictional amount because they fit with the nature and magnitude of the plaintiffs' alleged harms.  In *Felipe v. Target Corp.*, the plaintiff alleged serious physical injuries from a slip-and-fall in a Target store and sought damages "in an amount that will exceed the jurisdiction of the lower courts."[28]  Felipe declined Target's offer to stipulate to a $75,000 cap, and her counsel acknowledged at a hearing that the damages would "most likely" exceed that amount.[29]  The court found the amount-in-controversy requirement satisfied because of the refusal to stipulate and counsel's concession.[30]  A different judge in this district applied that same reasoning in *AJ Construction v. Next Insurance*, which involved a represented

---

[24] *Id.* at 512.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Felipe*, 572 F. Supp. 2d at 457.
[29] *Id.* at 459–60.
[30] *Id.* at 460.

5

plaintiff's fire-damage claim.[31]  The judge relied on an incident report valuing the loss at $156,492 and the plaintiff's refusal to cap those damages to conclude that remand was unwarranted.[32]

The record here bears little resemblance to the factual showings that supported the inferences drawn in *Oshana*, *Felipe*, and *AJ Construction*.  In each of those cases, the refusal to stipulate was meaningful because it aligned with evidence of substantial, concrete losses—millions in potentially disgorged profits, serious physical injuries, or a documented six-figure property loss.  Those plaintiffs also had counsel who assessed the scope of their clients' claims and the likely value of their remedies.  Nothing in the instant record provides a similar showing that Symington's damages approach the jurisdictional threshold.

In an effort to reach the threshold, Candela argues that Symington seeks the full $34,300[33] deposit "plus" the withheld amount.[34]  While true that his pre-litigation letter references the "entire $34,300 deposit, including the remaining $6,300 Candela still unjustly

---

[31] *AJ Constr.*, 2024 WL 3665938, at *2.

[32] *Id.*  Other district courts have generally concluded that a refusal to stipulate is not enough to satisfy the amount-in-controversy requirement.  *See e.g., Schiller v. David's Bridal, Inc.*, 2010 WL 2793650, at *5 (E.D. Cal. July 14, 2010) ("Evidence of failure to stipulate to the amount in controversy requirement is at best a factor in determining the amount, and at worse, irrelevant to the determination"); *Conrad v. 4Access Commc'ns. Co.*, 2009 WL 2157005, at *3 (S.D. Cal. May 21, 2008) ("attempting to force the plaintiff to enter a stipulation regarding the potential amount of damages would serve no effect in determining the actual amount in controversy"); *Valle v. State Farm Mut. Auto. Ins.*, 1997 WL 564047, at *2 (N.D. Cal. Aug. 27, 1997) ("Nor does the Court consider plaintiff's refusal to stipulate to lesser damages persuasive in evaluating the worth of her claims.").

[33] In one letter to Candela, Symington lists his total deposit as $34,300. ECF No. 17-1.  But his other filings refer to a $33,772.50 deposit (ECF No. 13 at 2), and Candela provides documents supporting that amount.  ECF No. 20 at 2; ECF No. 8-2.

[34] ECF No. 20 at 3.

retains," it ultimately demands only "the remaining $6,300."[35] The complaint reinforces that intent because it seeks the "[f]ull return of all deposit funds wrongfully withheld," which I reasonably read as the yet unrefunded balance, not a second recovery of funds already returned.[36] Viewed in context—and considering Symington's pro se status—the record supports a far narrower damages theory than the one Candela posits. At most, Symington seeks the withheld $6,300 and roughly $20,000 in asserted lost business opportunities and other costs, totaling approximately $26,000. To clear the $75,000 threshold, his punitive-damages request would need to supply nearly $50,000 in additional value.[37]

### 2. *Symington cannot make up the jurisdictional deficiency with punitive damages.*

Punitive damages can factor into the amount in controversy if they are available under state law,[38] and NRS 42.005 authorizes an award of "exemplary and punitive damages" for tort claims in Nevada when the plaintiff proves by clear and convincing evidence that the defendant is "guilty of oppression, fraud[,] or malice, express or implied."[39] Courts in this circuit have persuasively held that, while punitive damages may be included in assessing the amount in controversy, "the mere possibility of a punitive-damages award is insufficient" to satisfy the requirement.[40] Defendants must instead present evidence that punitive damages will more likely

---

[35] ECF No. 17-1 at 4–5 (cleaned up).

[36] ECF No. 3-1 at 5.

[37] Symington's complaint also seeks "costs of suit," which Candela argues should count toward the amount in controversy. But 28 U.S.C. § 1332 expressly exempts interest and costs from the calculation, *see* 28 U.S.C. § 1332(a), and Candela identifies no authority suggesting that those costs may be considered here.

[38] *See Gibson v. Chrysler Corp.*, 261 F.3d 927, 945 (9th Cir. 2001).

[39] Nev. Rev. Stat. § 42.005(1).

[40] *Burk v. Med. Sav. Ins. Co.,* 348 F. Supp. 2d 1063, 1069 (D. Ariz. 2004) (citing *Surber v. Reliance Nat. Indem. Co.*, 110 F. Supp. 2d 1227, 1232 (N.D. Cal. 2000)).

7

than not exceed the amount needed to reach $75,000, and evidence of jury verdicts in analogous cases is one accepted method of doing so.[41] So Candela cites three cases to support its punitive-damage argument.[42] None of these cases are remotely analogous to this one.

In *Prestige of Beverly Hills, Inc. v. Weber*, the Nevada Supreme Court upheld a punitive-damages award of $100,000 on top of $28,286 compensatory damages in a property-line case.[43] For more than ten years, the defendant ignored the plaintiff's repeated pleas to remove overgrown trees that had collapsed a boundary wall, exposing the plaintiff to trespassers, unsafe conditions for his family, and potential liability under a county code.[44] The defendant exacerbated the harm by attempting to extract $20,000 from the plaintiff to remove the trees and later defied a court order directing removal.[45] The court held that this long-running, deliberate misconduct amounted to "malice" under NRS 42.001.[46] And although the $100,000 punitive award produced a ratio slightly above 3:1, the court found it neither unconstitutional nor excessive because Nevada law allows punitive damages up to $300,000 when compensatory

---

[41] *Id.* (citing *McCaa v. Mass. Mut. Life Ins. Co.*, 330 F. Supp. 2d 1143, 1149 (D. Nev. 2004)).

[42] ECF No. 20 at 8 (citing *Prestige of Beverly Hills, Inc. v. Weber*, 2012 WL 991696 (Nev. March 21, 2012) (stating that a punitive-damage ratio of up to 4:1 is "well within the accepted ratios"); *Nachman v. Regenocyte Worldwide, Inc.*, 2014 WL 12788995, at *2 (D. Nev. Oct. 21, 2014) (finding that $100,000 is a reasonable and proportionate award of punitive damages on top of $49,950 fraud damage award); *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 776 (9th Cir. 1984) (holding that a $50,000 punitive-damages award is reasonable in relation to $36,880 compensatory damages considering the defendant's fraudulent conduct under Idaho law)).

[43] *Prestige of Beverly Hills*, 2012 WL 991696 at *5–7.

[44] *Id.* at *6.

[45] *Id.*

[46] *Id.* at *7.

8

damages are below $100,000, and the defendant's behavior was sufficiently reprehensible to warrant a punitive sanction of that magnitude.[47]

In *Nachman v. Regenocyte*, another judge in this district upheld a $100,000 punitive-damages award because the defendants' conduct showed deliberate fraud and a conscious disregard for the plaintiff's health and safety.[48] Nachman relied on the defendants to provide life-saving stem-cell treatment for a serious cardiac condition, and he paid them in full based on their repeated representations that treatment was necessary and would be performed.[49] After accepting his money, however, the defendants repeatedly misrepresented their ability to provide the procedure, failed to deliver any treatment, and refused to refund the payment—all while Nachman's condition remained potentially life-threatening.[50] And because the $100,000 punitive award amounted to only twice the compensatory damages, was proportionate to the harm, and was necessary to deter similar misconduct—especially in light of evidence that other patients suffered the same deception—the court held that the award was reasonable and consistent with constitutional due-process limits.[51]

Finally, in *Hatrock v. Edward D. Jones & Co.*, the Ninth Circuit upheld punitive-damages awards of $50,000 against a broker and $200,000 against a brokerage firm based on conduct that met Idaho's punitive-damages standard.[52] The broker in *Hatrock* engaged in excessive trading, misrepresented rumors as verified facts, and urged inexperienced investors

---

[47] *Id.*
[48] *Nachman*, 2014 WL 12788995, at *2–3.
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Hatrock*, 750 F.2d at 772.

into risky positions—conduct the court described as an "extreme deviation" from accepted broker standards and evidence of a malicious or fraudulent state of mind.[53] Because he functioned as a de facto manager, punitive liability also extended to the firm.[54] The jury's $250,000 punitive award, on top of $36,880 in compensatory damages, survived appellate review because Idaho law permits such ratios when the conduct is sufficiently reprehensible and the defendant's wealth supports deterrence.[55]

Candela does not explain how the facts in those punitive-damages cases map onto the allegations here, and the record offers no basis to draw that analogy. The awards in *Prestige of Beverly Hills*, *Nachman*, and *Hatrock* rested on conduct that was qualitatively different. *Prestige* involved a decade of hazardous indifference and a defiance of court orders; *Nachman* concerned misrepresentations about life-saving medical treatment; and *Hatrock* addressed fraudulent investment advice by a managerial agent in Idaho. Symington's allegations arise from a single commercial transaction involving a deposit, a refund agreement, and disputed representations about passenger capacity. Without a closer factual parallel, Candela has not shown that those decisions make punitive damages here likely enough to impact the amount-in-controversy analysis.

---

[53] *Id.* at 776.
[54] *Id.* at 771–72.
[55] *Id.* at 772–73.

### 3. *Symington's demand letters are not a reasonable estimate of damages to satisfy the amount in controversy.*

Candela next relies on Symington's demand emails[56] as proof that the amount in controversy has been met.[57] The first is a pre-suit e-mail that spans four pages and accuses Candela of a "long-running pattern" of deceptive practices tied to his attempted purchase of a C-8 vessel.[58] The letter ultimately demands the return of the remaining $6,300 from Symington's $34,300 deposit and an additional $20,000 in other damages.[59] Symington also states that, if litigation proceeds, he will seek treble damages based on the alleged fraudulent nature of Candela's conduct and asserts that such a multiplier would place Candela's exposure "well above $100,000," apart from fees and related costs.[60] The email concludes with threats to file suit, report Candela to regulators, and publicize the dispute if it is not resolved within seven days.[61]

---

[56] ECF Nos. 17-1, 17-2.

[57] ECF No. 20 at 5–8.

[58] Symington asserts that he first learned in June 2025 (three months after he signed the refund agreement)—through a text exchange with a Candela representative—that the C-8 cannot hydrofoil with more than six people onboard, a limitation he claims was never disclosed and that rendered the vessel unworkable for his planned eight-passenger commercial operations. ECF No. 17-1 at 2. The email also recounts various introductions and strategic assistance he says he provided Candela—including outreach to public-sector transportation agencies, arranging demonstration rides, and connecting the company with a U.S. boatbuilder—and expresses frustration that these efforts were met with what he characterizes as evasive or dismissive treatment. *Id.* at 3.

[59] Symington asserts that the $20,000 reflects his unreimbursed travel, lost time, derailed commercial timelines, reputational harm with investors, and business losses in Boston and Rhode Island. ECF No. 17-1 at 4. But he provides no documentation—no receipts, travel records, business forecasts, or communications with investors—to show how those categories translate into dollars. Nor does he explain how reputational harm, lost commercial opportunities, or "derailed timelines" were quantified or why they amount to the figure he selected.

[60] *Id.*

[61] *Id.*

Symington later sent a second email after Candela's counsel asked him to stipulate that his damages did not exceed $75,000.[62] In that message, he rejects counsel's request in strongly worded terms and characterizes the proposed stipulation as "absurd," accusing Candela of pursuing an "outrageous diversity scheme" and asserting that it would "boomerang back" on the company.[63] The blustering correspondence does not discuss additional injuries, changed circumstances, or new information bearing on the value of Symington's claims. Instead, he warns that Candela is "running out of runway," that "the clock is ticking," and that "the crash is coming," and then proposes a new settlement amount of $150,000.[64] He describes that figure as a non-negotiable "take-it-or-leave-it number" but does not link it to any damages calculation, factual support, or legal basis.[65]

Symington has not disavowed the representations he made in those emails, so Candela contends that those e-mails operate like the settlement letter the Ninth Circuit found sufficient in *Cohn v. Petsmart, Inc.*[66] In *Cohn*, the plaintiff sought injunctive and declaratory relief related to a trademark dispute and stated in a demand letter that "the mark is worth more than $100,000 to him."[67] The Ninth Circuit accepted that estimate because the amount in controversy for equitable relief turns on the value of the object of the suit, and the plaintiff placed that value

---

[62] ECF No. 17-2 at 2.
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 (9th Cir. 2002).
[67] *Id.* at 839–40.

above $100,000.[68]  The court also noted that the plaintiff never disavowed the letter or offered contrary evidence to that number.[69]

But *Cohn* offers limited guidance here for two reasons.  First, *Cohn* involved injunctive and equitable claims whose value can be measured by the plaintiff's subjective valuation which is different from a monetary claim like this one.  Second, although *Cohn* did not define what makes a demand "reasonable," the Ninth Circuit later clarified that a demand is reasonable if "sufficiently supported by details of the injuries claimed" even if it's not mathematically precise.[70]  So whether a plaintiff disavows a demand may be a relevant consideration, but it is not dispositive of the reasonableness inquiry.

Candela also relies on *Brissett v. Enterprise Leasing Co.-W., LLC*[71] for the proposition that it need not provide independent evidence supporting the reasonableness of Symington's demands.[72]  It points out that the plaintiffs in *Brissett* submitted a four-page demand letter outlining their claims and damages and that Symington's pre-suit email is likewise four pages long with claims and damages.[73]  But *Brissett* is not as analogous as Candela suggests.  *Brissett* involved a wrongful-arrest dispute brought by a mother and her four children and sought $1.5

---

[68] *See id.* at 840.

[69] *Id.*

[70] *Babasa v. LensCrafters, Inc.*, 498 F.3d 972, 975 (9th Cir. 2007).  Other district courts in this circuit have followed this reasoning and declined to rely on settlement demands that lack a clear factual basis.  *See Eva Montalvo v. Wal-Mart Assocs., Inc.*, 2025 WL 3514541, at *1–2 (C.D. Cal. Dec. 8, 2025) (finding the settlement demand an unreasonable estimate because the case did not seek injunctive or other equitable relief—so the plaintiff's subjective valuation was irrelevant—and the record lacked support for the asserted amount)*; Wolf v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 6882937, at *4 (D. Nev. Dec. 4, 2014) (finding that the plaintiff's $100,000 settlement demand was not a reasonable estimate of his claim).

[71] *Brissett v. Enter. Leasing Co.-W. LLC*, 2024 WL 4580964, at *1 (D. Nev. Oct. 23, 2024).

[72] ECF No. 20 at 7.

[73] *Id.*

13

million for the mother and $175,000 for each child based on extensive emotional, professional, and familial harm.[74]  The four-page demand letter was supported by fourteen exhibits and cited two comparable cases in which the plaintiffs recovered more than $75,000.[75]

Symington's e-mails are of a different character than the one at issue in *Brissett*.  The monetary requests aren't accompanied by any exhibits or analogous case outcomes.[76]  Symington's demand for treble damages is also not supported by any statute or supporting documentation, and the facts he alleges don't appear to support such a remedy either.[77]  Without factual or evidentiary grounding, the email does not function like the detailed, exhibit-supported demand in *Brissett*.  The second e-mail has even less evidentiary support and includes an unexplained jump from $100,000 to $150,000 that further undercuts the reliability of either amount as a reasonable estimate of the value of Symington's claims.  Because this increased demand is unaccompanied by factual support or a damages analysis tied to the allegations in the complaint, it is of little probative value in determining the amount in controversy.

In sum, the record does not show that the amount in controversy meets the jurisdictional threshold.  I therefore remand this case back to state court.  And because I find that remand is required on this basis, I need not and do not reach Symington's remaining procedural-defect arguments.

---

[74] *Brissett*, 2024 WL 4580964, at *4–5.
[75] *Id.*
[76] *See* ECF No. 17-1.
[77] *Id.* at 4.

**Conclusion**

IT IS THEREFORE ORDERED that Symington's motions to remand **[ECF No. 10, 11, 19] are GRANTED in part, and this case is remanded back to state court based on lack of jurisdiction.** IT IS FURTHER ORDERED that Candela's motion to dismiss **[ECF No. 8] is DENIED as moot and without prejudice to Candela's ability to refile it in state court.**

IT IS FURTHER ORDERED that the Clerk of Court is directed to **REMAND this case back to the Eighth Judicial District Court, Department 17, Case No. A-25-927816-C**, and CLOSE THIS CASE.

_____
U.S. District Judge Jennifer A. Dorsey
January 13, 2026